### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL M. CICCARONE,** | : | |
| **RHONDA MEKOSH** | : | |
| **and MICHAEL MEKOSH** | : | |
| **Plaintiffs** | : | **C.A. No. 03-1660** |
| **v.** | : | |
| | : | |
| **B.J. MARCHESE, INC.** | : | |
| **BENJAMIN MARCHESE, JR.,** | : | |
| **BENJAMIN MARCHESE, III** | : | |
| **Defendants** | : | |

### JOINT PETITION OF CLASS PLAINTIFFS' COUNSEL FOR
### AN AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF COSTS

Counsel for Class Plaintiffs ("Petitioners") hereby submit this Joint Petition for reimbursement of expenses and costs in the amount of $111,514.31 and for an award of attorney's fees of $1,118,339.50, plus interest accrued thereon.

1.    The fees and expenses requested are reasonable and are provided for in the June 14, 2004 Class Action Settlement Agreement and Release ("Settlement Agreement").

2.    The settlement was achieved following extensive litigation and arms-length negotiations between Plaintiffs, Defendants, Erie Insurance Exchange, and their respective counsel, extensive independent investigation, discovery, rulings on class certification and summary judgment, and the supervision of two (2) judicial officers.

3.    The settlement provides substantial equitable relief to the Class, which they would not receive but for this Class Action.

4.    Equitable relief is provided to Group A Class Members in the form of, *inter alia,* Defendants jointly sending notification with a consumer dispute verification form to Credit Reporting Agencies representing that (1) the credit report and/or inquiry was obtained without a permissible purpose; and (2) directing each Credit Reporting Agency to immediately correct its

records and permanently delete the identified inquiry promptly.  This equitable relief is presently ongoing.

5.      Equitable relief is provided to Group B Class Members in the form of, *inter alia,* Defendants jointly sending notification with a consumer dispute verification form to Credit Reporting Agencies representing that (1) the loan or credit obligation referenced in that letter is not a loan obligation incurred by the identified Class Member; and, (2) directing both the lender(s) and the Credit Reporting Agency to immediately correct their records and permanently delete such an entry immediately.  Additionally, Class Counsel will submit to the Credit Reporting Agencies available information regarding the consumer, the identity of the fraudulent or unauthorized loan and the date thereof as a Request for Reinvestigation of disputed information pursuant to FCRA §1681i(a).  The Credit Reporting Agencies will investigate those disputes and notify Class Counsel and defense counsel of the results of the reinvestigation.  This equitable relief is presently being implemented.

6.      Equitable relief is provided to Group C Class Members in the form of, *inter alia,* Defendants jointly sending notification with a consumer dispute verification form to Credit Reporting Agencies representing that (1) the loan and credit obligation referenced in the letter relating to the identified Class Member is, after the date of the trade-in, no longer a loan obligation incurred by the identified Class Member; (2) directing both the lender and the credit reporting agency to immediately correct their records and delete reporting any such entry as "delinquent" immediately; and, (3) representing that no delinquency on the identified loan obligation after the trade-in date should ever be referenced or re-inserted again in the identified Class Member's consumer report.  Additionally, Class Counsel will submit to the Credit Reporting Agencies available information regarding the consumer, the identity of the fraudulent or unauthorized loan

and the date thereof as a Request for Reinvestigation of disputed information pursuant to FCRA §1681i(a).  The Credit Reporting Agencies will investigate those disputes and notify Class Counsel and defense counsel of the results of the reinvestigation.  This equitable relief is presently being implemented.  Additionally, Defendants have executed and delivered to Plaintiffs' counsel written consents to any petitions to be filed in state court by the Class Members necessary to evidence Defendants' consent to a transfer of the title of the identified trade-in vehicle(s) to the senior lien holder, or if no secured party, to the bona fide purchaser of the identified vehicle.  These petitions will be filed.  There are approximately thirty-three (33) separate lawsuits that are either pending or planned in state court to clarify and transfer title affecting Group C of the Class.

7.     In addition, several Group C Members are Defendants in ongoing state court matters in which lenders are seeking interest, penalties and fees arising from the Defendants' failure to satisfy pre-existing liens.  Class counsel will undertake to resolve these lawsuits.

8.     The settlement also provides monetary relief of $2,450,000 to fund the prosecution and defense of litigation to transfer and clear title for Group C Class Members; to address alleged existing lien obligations for Group C Class Members who traded-in vehicles and for whom the lien was not paid by Defendants; to be distributed to Group B and Group C Class Members on a *pro rata* basis as compensation for credit damage in proportion to the number of unauthorized loans and/or unpaid lien obligation transactions; and for reimbursement of all attorney's fees and litigation costs.

9.     For reasons more fully set forth in the attached the supporting Memorandum, which is incorporated herein by reference, Petitioners believe that this request for attorney's fees and reimbursement of expenses is fair, reasonable and fully consistent with relevant authority.

10.     As more fully reflected in the attached affidavits of counsel, attorneys and paralegals in Petitioners' firms have devoted a total of 4,179.15 hours to litigate this case.  Elliott Greenleaf & Siedzikowski, P.C. devoted 3,606.95 hours and Lundy, Flitter, Beldecos & Berger, P.C. devoted 572.2 hours.  At current hourly rates, the lodestar for Petitioners' firms is $1,118,339.50 as of July 31, 2004.

11.     As reflected in the individual affidavits of counsel, Petitioners' expenses total $111,514.31.  Elliott Greenleaf & Siedzikowski, P.C. incurred $64,550.31 and Lundy, Flitter, Beldecos & Berger, P.C. incurred 46,964.  Pursuant to the Settlement Agreement, these expenses include reimbursement of the costs of providing class certification and settlement notice, including the cost of notice by publication on December 14 and 17, 2003 and January 11 and 14, 2004 and the initial notice by direct mail on December 23, 1995, as well as at various times thereafter, and the second notice on July 26, 2004.

12.     Petitioners will submit a proposed form of final order to approve the settlement, proposed plan of allocation and Petitioners' request for attorney's fees and reimbursement of expenses after the September 16, 2004 objection and opt-out period has closed and prior to the October 4, 2004 hearing.

WHEREFORE, Petitioners respectfully request this Court to award attorney's fees of $1,118,339.50, and reimbursement of expenses and costs of $111,514.31, plus interest accrued thereon.

Respectfully Submitted,

/s Timothy T. Myers
Timothy T. Myers, Esquire
Mark A. Kearney, Esquire
Elliott Greenleaf & Siedzikowski, P.C.
Union Meeting Corporate Center V
925 Harvest Drive, P.O. Box 3010
Blue Bell, PA   19422

/s Cary L. Flitter
Cary L. Flitter, Esquire
Lundy, Flitter, Beldecos & Berger, P.C.
450 North Narberth Avenue
Narberth, PA   19072

Attorneys for Plaintiffs

Dated:  August 16, 2004

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL M. CICCARONE,** | : | |
| **RHONDA MEKOSH** | : | |
| **and MICHAEL MEKOSH** | : | |
| **Plaintiffs** | : | **C.A. No.  03-1660** |
| **v.** | : | |
| | : | |
| **B.J. MARCHESE, INC.** | : | |
| **BENJAMIN MARCHESE, JR.,** | : | |
| **BENJAMIN MARCHESE, III** | : | |
| **Defendants** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT PETITION**
**OF CLASS COUNSEL FOR AN AWARD OF ATTORNEY'S**
**FEES AND REIMBURSEMENT OF COSTS**

Counsel for Class Plaintiffs ("Petitioners" or "Class Counsel") hereby submit this Memorandum of Law in support of their Petition for reimbursement of expenses and costs and for an award of attorney's fees. Class counsel seek $1,118,339.50 in fees and reimbursement of $111,514.31 in costs. These fees and expenses are reasonable, were necessarily incurred in the litigation and settlement, and are provided for in the Settlement Agreement.

**I.      INTRODUCTION**

The settlement provides substantial equitable relief to the Class, which they would not receive but for this Class Action. Additionally, the Settlement Agreement provides a monetary fund of $2.45 million to provide compensation to Group B and Group C Class Members for credit damage caused by identity theft and the failure of Defendants to pay existing liens on trade-in transactions, and to pay for attorney's fees and reimburse the costs of litigation.

There are two basic methods to determine a fair and reasonable reimbursement of attorney's fees and costs in class actions:  (1) the lodestar and (2) the percentage of recovery method. Petitioners believe that the best method of determining an appropriate fee in this case is the lodestar

because of the hybrid nature of the settlement that combines both monetary and equitable relief. However, Petitioners also provide a cross-check of the lodestar against the reasonably evaluated gross recovery of the equitable and monetary relief.

For the reasons described below, Class Counsel believe that the value of the equitable relief is equal to or greater than the amount of monetary relief of $2.45 million.  A reasonable evaluation of the equitable relief is well in excess of $3.7 million, which is how Congress legislated a value of $1,000 per violation of the FCRA as a statutory penalty.[1]  Another reasonable measure of the equitable relief is the legal services that were required to accomplish it.  This equitable relief is continuing. Petitioner's total lodestar of fees and costs of $1,229,853.81 itself is therefore a reasonable measure of value for the equitable relief, because that is what was necessary to achieve it.  Plaintiff's expert, Richard LeFevre, who was qualified by this Court as an expert after a *Daubert* hearing, opines that the value of the equitable relief is $5,094,500.

Petitioners seek an award of attorneys' fees of $1,118,339.50, and reimbursement of costs and expenses in the amount of $111,514.31 in costs to be deducted from the $2.45 million dollar settlement fund.[2]   The attorneys' fees requested by Petitioners equals a range between approximately 15% and 33% of the aggregate of the value to the Class of the settlement based upon different methods of evaluating the equitable relief.  This range of percentage is reasonable and within the range approved in common fund cases.  Thus, the requested award is fair and reasonable

---

[1] Of the 3,700 Class Members, several people had their credit reports pulled without authorization several times.  Therefore, the $3.7 million is conservative.

[2] Plaintiffs' proposed Plan of Allocation includes the request of a $75,000 fund for counsel fees for future prosecution and defense of litigation to transfer and clear title for Group C Class Members who purchased vehicles without clear title.  This amount is not included in the instant Fee Petition because it is part of the proposed Plan of Allocation and the work is in process and subject to the final approval of the proposed settlement.  Plaintiffs seek approval of this $75,000 fund at the October 4, 2004 hearing.

in light of the benefits which the settlement conferred upon the Class, the significant risks of litigation, and the high caliber of legal services performed by counsel.

Submitted together with the Petition and the instant Memorandum and incorporated by reference herein are the affidavits of Mark A. Kearney, Esquire and Cary L. Flitter, Esquire. *See* Exhibits "A" and "B."

## II.    <u>STATEMENT OF THE FACTS</u>

In April 1994, B. J. Marchese formed the Dealership for the purpose of selling vehicles. The Dealership had two sales lots during the Class Period: "Marchese Chevrolet of Royersford" sold and leased <u>new</u> vehicles, and "AutoWorld" sold and leased <u>used</u> vehicles.   Defendant B.J. Marchese was the president, sole officer and sole owner of the Dealership.  His son, Defendant Ben Marchese, was the Controller.

Most cars purchased through the Dealership were financed.  Of those, most of the new vehicles were financed through General Motors Acceptance Corporation ("GMAC"). The Dealership was required to repay GMAC when the vehicles were sold.  GMAC provided the "floor plan financing" for the Dealership, which was the primary inventory financing for both the Dealership and consumers.  Other third-party financial institutions, like Sovereign Bank, provided retail credit lines, which provided other sources of financing for purchasers in the event that GMAC's financing was not available for a customer.  The titles to the cars on the Dealership lot were held by the Dealership until the consumer sale.

As part of its dealer financing for consumers, the Dealership acted as an agent for the bank. The Dealership would sign the contract on behalf of the bank and the bank would hold the Dealership responsible.  The bank gave the Dealership a blank check book and authorization to write checks to the Dealership after a sale was consummated, an arrangement common in the auto

sales business.

Between 1996 and 1998, the Dealership began abusing its financial agreements with its primary lender of new vehicles, GMAC, and with its third-party lenders. The Dealership began a practice of writing checks for vehicle sales *before* the sale was actually consummated.  Certain of the sales were *never* consummated, and the money improperly remained in the Dealership accounts. By 2001, the Dealership owed approximately $1.5 million to its "Floor Plan Financer," GMAC, and third-party lenders National City and Wilmington Trust.  The Dealership had to make restitution to third-party lenders National City and Wilmington Trust for at least $280,000.

## A. Defendants Improperly Accessed Group A Consumer Reports without Authorization

To facilitate consumer financing, the Dealership had contracts with TransUnion, Equifax and Experian to obtain consumer reports.  The Trans Union invoices list all the persons for whom consumer credit reports were obtained.  The Dealership policy and practice was to access consumer reports if there was any possible chance of a deal.  This practice violated the FCRA.  Defendants obtained approximately 3664 consumer reports without authorization, and 46 consumer reports long *after* the closing of a legitimate transaction with Defendants.  However, Defendants' insurance company contended that there was no coverage for this FCRA claim.  These Class Members in Group A will receive equitable relief in the form that all references to their credit being accessed by Defendants will be expunged from their credit history.

## B. Defendants Impermissibly Placed Bogus Loans In Group B Class Members' Names.

In 2001, GMAC audited the Dealership.  GMAC found that the Dealership was "out of trust" of approximately $1.2 million for the General Motors automobiles and threatened to close it if it did not immediately pay the money back.  Defendant Ben Marchese, the Dealership's Controller,

admitted that he "put in a lot of ghost loans… to come up with money."  Every such bogus loan was obtained without the consumers' authorization and knowledge.  In total, Defendants obtained and used confidential consumer reports to receive $4,078,479.71 of unauthorized loans from seven banks and published them on eighty-nine Class Members' consumer reports.

As a direct and proximate result of the Defendants' failure to satisfy these liens, Plaintiff and the Class Members in Group B, as defined by this Court's October 8, 2003 Class Certification Order, have suffered, and will continue to suffer, credit impairment as there are existing liens that continue to be reported on their credit report, continuing collection calls and dunning letters, time and expense in restoring credit, and continuing damages.  At trial, Plaintiffs were seeking damages for credit harm to Group B Class Members in the amount of $4,384,400.00.  Because of the limited amount of insurance funds available to satisfy any potential judgment, Class Counsel are implementing equitable relief to remedy the credit damage to Group B Class Members.

**C.**    **Defendants Failed to Satisfy Existing Liens On Group C Class Members' "Trade-In" Vehicles.**

Defendants, like most car dealerships, also received vehicles as "trade-in" or "credit" toward the purchase or lease of a vehicle from the Dealership.  Despite the obstruction of discovery, Class Counsel persisted in obtaining all of the missing "deal jackets" that proved Defendants' contractual obligation to pay off these liens for all of the Group C Class Members.  Pennsylvania requires a dealership to pay off such pre-existing liens within 90 days.  *See* 75 Pa. C.S.A. §1111(a.1).

Defendants failed to pay off the pre-existing liens on approximately fifty (50) vehicles traded in by Group C Class Members.  In total, the pre-existing liens on these fifty vehicles were $677,111.74 in principal.  The Class Members who traded in their vehicle may be contractually liable for this debt, plus the ongoing interest, are being sued in several state courts by the lenders,

and have substantially impaired credit.  In addition to owing the $677,111.74 on pre-existing liens, the Group C Members have suffered credit damage, as specifically described by Plaintiffs' expert, to be worth $1,308,180.00.

In addition, persons in Group C of the Class purchased the previously "traded-in" vehicles from the Dealership for a total of $601,609.  Now, these purchased vehicles have been repossessed, or the Class Members have not been able to drive the vehicles because they cannot get title, as the previous lien holder will not release its lien without payment.  As such, these persons purchased a depreciating or worthless asset for cash, and/or are not able to drive their vehicle without title.

Class Counsel are currently negotiating with the lenders to satisfy the unpaid liens on trade-in vehicles.  Class Counsel are also providing legal services to clear title for the purchasers of the liened vehicles.  Because of the limited amount of insurance funds available to satisfy any potential judgment, Class Counsel are implementing equitable relief to remedy the credit damage to Group C Class Members.

## III.   <u>PROCEDURAL HISTORY OF THE LITIGATION</u>

The work performed by Counsel for Plaintiffs in this action was substantial.  The litigation was pursued vigorously by Class Counsel, and opposed aggressively by counsel for the Defendants for over eighteen months, entirely on a deferred and contingent fee basis.

On March 19, 2003, Plaintiffs commenced this action seeking, *inter alia*, class certification, damages and equitable relief, after performing an extensive pre-complaint investigation, including interviews of witnesses, review of boxes of files, and substantial legal research into the claims and their potential defenses.  Plaintiffs alleged that Defendants:  obtained and used consumer credit reports for impermissible and unauthorized purposes, including to obtain unauthorized loans in consumers' names, in violation of the Fair Credit Reporting Act, 15 U.S.C. §1681b <u>et</u> <u>seq</u>.

Case 2:03-cv-01660-CMR   Document 148   Filed 08/16/04   Page 12 of 45


("FCRA"); failed to satisfy pre-existing liens on certain vehicles traded-in by consumers, and certain vehicles sold to consumers; and caused credit obligations on consumers' credit reports without their knowledge, resulting in further damage for invasion of credit privacy and past and future damages for harm to credit reputation.

Defendants accepted service on April 15 and 18, 2003. After Defendants failed to file a response to the Complaint, Class Counsel contacted personal counsel for one of the Defendants, and were advised that Defendants' insurance carrier had been placed on notice. Class counsel demanded copies of the insurance policies. On May 20, 2003, Class Counsel notified the Court of the nature and extent of insurance coverage and Class Counsel's belief that there was coverage for Plaintiffs' claims. Class Counsel also copied Erie Insurance Exchange on the letter to the Court concerning coverage.

On May 22, 2003, counsel for Erie Insurance Exchange called Class Counsel and advised that it would provide the insureds with a defense subject to a reservation of rights and requested that Class Counsel refrain from entering a default judgment. On June 9, 2003, Defendants filed Answers to the Complaint, asserted numerous Affirmative Defenses, and denied and continue to deny they have any liability to Plaintiffs and the Class Members. On June 17, 2003, Plaintiffs filed their Motion for Class Certification.

On June 18, 2003, Plaintiffs filed their Preliminary Report required by the Court for the Rule 16 conference. On June 23, 2003, the Court convened a Rule 16 Pre-Trial Conferences. Prior to the conference, counsel for the parties engaged in a lengthy conference to facilitate management of the litigation. During this conference, Class Counsel requested defense counsel to consider stipulating to class certification and to analyze the extent and nature of insurance coverage. Defense counsel did not agree to either request.

- 7 -

Defendants' obstruction of discovery and defense strategies caused substantial work to be performed by Class Counsel.  For example, Defendants never produced any of the key deal jackets for the class members, which detailed their transactions and credit files.  They never produced any documents relating to the bogus loan transactions or the unpaid liens on trade-ins, or any documents relating to the titles of the liened vehicles.  Instead, they feigned ignorance, and obstructed discovery throughout the litigation.

On June 25, 2003, Plaintiffs issued Document Requests to Defendants.  On August 27, 2003, Plaintiffs issued sets of interrogatories to each of the Defendants.  On July 30, 2003, Defendants responded to the Document Requests.  Defendants never produced a privilege log and sporadically produced documents over the course of several weeks that amounted to approximately a single red-well file folder of documents.  In all of the documents produced by Defendants, including documents they received pursuant to subpoenas, and then re-produced to Plaintiffs, Defendants stamped them with a confusing bates-stamp system that required them to be all reorganized, re-stamped and indexed by paralegals.  These paralegals are highly skilled, well-trained and were closely supervised.  The work by Petitioners' highly skilled paralegals in organizing the documents in this litigation was enormous and invaluable.

Significantly, Counsel for Defendant B.J. Marchese, Inc. had previously advised the Court on the record at the on June 18, 2003 Rule 16 Conference, and repeatedly to Plaintiffs' Counsel, that his clients did not have any documents because they were all in the possession of James J. Oliver, Esq., former counsel to B.J. Marchese, Inc. in other matters.  Accordingly, Plaintiffs promptly issued a Subpoena to Attorney Oliver on July 1, 2003.  On July 24, 2003, Defendants filed a Motion for a Protective Order concerning Plaintiffs' Subpoena to Attorney Oliver.  On July 30, 2003, Plaintiffs filed their Response to Defendants' Motion for a Protective Order concerning the

Defendants' documents in the possession of Attorney Oliver.

Because the Court had not ruled on the Motion for a Protective Order concerning Defendants' documents in the possession of Attorney Oliver, and in order to proceed with the depositions of Defendants prior to the close of discovery, Plaintiffs agreed to allow Attorney Oliver to produce all documents responsive to **Plaintiffs'** Subpoena *to counsel for Defendants* in this action for review and production. However, the Oliver documents were still not voluntarily produced, and the issues were ultimately resolved through a conference with the Court after full briefing.

On September 16, 2003, Plaintiffs' counsel took the deposition of Defendant Benjamin J. Marchese, Jr. Incredibly, Mr. Marchese testified that he had given his counsel fifteen (15) boxes of documents two months before the deposition. Defendants never produced these documents and never identified them as being withheld. Mr. Marchese, Jr. then waived any privilege to the Oliver documents at his deposition by expressly stating that he had no objection to their disclosure. Nevertheless, Class Counsel was required to cross-examine B.J. Marchese without these 15 boxes of corporate documents and the 6 boxes of Oliver documents. After these approximately 21 boxes of documents were eventually produced, they all had to be organized and indexed for use as evidence.

On September 17, 2003, Plaintiffs filed a Motion to Compel all of these documents. Class counsel also commenced a comprehensive third-party discovery strategy because of Defendants' obstruction. Although *Defendants* had undertaken the responsibility of obtaining third-party discovery from the Credit reporting Agencies, TransUnion, Equifax and Experian, after six months, Defendants had never obtained the actual records. Therefore, Class Counsel issued subpoenas to them, filed motions to compel and obtained the documents. Plaintiffs issued subpoenas to the car dealership that purchased the Defendants' Dealership, Defendants' accountants, their banks, and to

all of the financial institutions that financed vehicles or the Dealership, including to Sovereign Bank, Citadel Federal Credit Union, Citadel Financial Services, Inc., GMAC, Interim Funding, Long Beach Acceptance Corp., Citizens Bank, Citizens Automobile Finance, Wilmington Trust Bank, Charter One, AmeriCredit Financial, AllFirst Bank, Harleysville National, Fleet Bank, Beneficial Savings Bank, WSFA Bank, Triad Financial, Toyota Financial Services Corp., Union State Bank Leasing, Volkswagon Credit, Wells Fargo Auto Financial, World Omni Financial Corp., American Honda, BMW Financial Services, N.A., Chase Automotive Finance, Chrysler Financial Services, Ford Motor Credit, G.E. Capital, Key Bank, and Onyx Acceptance Corp., and US Bank. Plaintiffs were required to file motions to compel or respond to motions for protective orders to obtain records from certain of these lenders, including from Sovereign Bank.

On October 8, 2003, the Court heard argument and ruled on several outstanding discovery motions, and on class certification.  The Court granted Plaintiffs' Motion for Class Certification and defined the Class as follows:

> All persons injured during the period of time from March 19, 2001 through the present ("Class Period") as members of one or all of the following groups:
>
> (a)     Plaintiffs and persons who had their consumer report(s) obtained by any defendant for whom the defendants cannot produce authorization of permissible purpose (Group A); and/or
>
> (b)     Plaintiffs and persons with loan obligations for vehicles allegedly sold or leased by a defendant that they did not buy or lease from a defendant (Group B); and/or
>
> (c)     Plaintiffs and persons with unpaid loan obligation(s) for vehicles after title was given to a defendant under an agreement that the loan obligation(s) would be paid by a defendant (Group C).

The parties negotiated with TransUnion, Experian and Equifax to obtain credit records of the named Plaintiffs and to institute reinvestigations of their disputes.  The parties also negotiated

and executed a Confidentiality Agreement to protect the sensitive nature of credit information for the Plaintiffs and the Class. Class Counsel then briefed the "good cause" issues, and submitted the proposed confidentiality agreement as a Protective Order.

At this time, Defendants had still not produced the Oliver documents and other undisclosed documents. In October, 2003, Defendants produced a Privilege Log to Plaintiffs. On October 22 and 23, 2003, the parties filed briefs concerning the privileges asserted by defense counsel to the Oliver documents. On October 24, 2003 and November 3, 2003, the Court granted Plaintiffs' Motion to Compel the Oliver documents. Plaintiffs' later identified several of the Oliver documents in their February 17, 2004 Pre-Trial Memorandum as being key trial exhibits.

On November 24, 2003, Defendants filed motions to amend the definitions of the Class, which Plaintiffs opposed on December 3, 2003. On December 9, 2003, the Court denied Defendants' Motion to amend the definition of the Class, and approved the form of Notice. Class Counsel complied with all of the requirements of this Court's December 9, 2003 Order.[3] On December 14, 2003 and January 11, 2004, Class Counsel published the Court approved form of Notice in The Mercury located in Pottstown, Pennsylvania. On December 17, 2003 and January 14, 2004, Class Counsel published the Notice in The Times Herald located in Norristown, Pennsylvania. On December 23, 2003, as well as at various times thereafter, the first Notice, approved by this Court in its December 9, 2003 Order, was mailed by first class, postage prepaid, to members of the Class. Any potential members of the Class who wished to exclude themselves from the Class were required to file with the Court a written Request For Exclusion by January 15, 2004.

---

[3] Class Counsel will file a Certification of Compliance with the Court's December 3, 2003 and July 16, 2004 Orders after the opt-out and objection period has ended on September 16, 2004 and before the October 4, 2004 fairness hearing to address any opt-outs or objections. However, as of this date, Class Counsel has fully complied with both Orders.

Class Counsel timely received only nine (9) of the required written Requests For Exclusion.  Any potential member of the Class who wished to enter an appearance through counsel of choice was required to do so by January 15, 2004.  No potential class member filed any such entry of appearance.

In December 2003, Plaintiffs located boxes of the missing "deal jackets" in the attic of Chevrolet of Limerick, which had purchased the defunct Marchese dealership building and lot. Class Counsel, and its paralegal team, was required to spend hours on site inspecting these boxes of deal jackets and organizing them to be removed systematically, and in such a manner as to not disrupt the current owners' business or record-keeping.   Class Counsel and their paralegals reviewed approximately 4,760 deal jackets in place at Chevrolet of Limerick, and obtained over 420 original deal jackets released into the custody of Class Counsel by Chevrolet of Limerick.  Each deal jacket contained numerous individual documents.

On February 5, 2004, this Court scheduled a settlement conference for February 27, 2004. On February 17, 2004, Plaintiffs filed: (1) a Motion for Partial Summary Judgment for Counts I, II, III, IV, VI and VII; (2) a Motion for Partial Summary Judgment Seeking Declaratory and Equitable Relief under Count V; (3) a four volume Appendix in support of summary judgment; (4) Proposed Stipulated Facts and (4) a Pre-Trial Memorandum.  The evidence compiled and detailed in support of summary judgment was required to be organized for an orderly presentation of proofs at trial.  It crystallized for the parties and the Court the proofs required for the motions, trial and for settlement.

For example, attached to the Proposed Stipulated Facts were detailed descriptions with evidentiary citations of credit reports obtained by Defendants for all of the 3,700 Group A Class members for whom there were either no corresponding authorizations or any transactional documentation, or for whom the only documentation were remote in time.  This required paralegals

to exhaustively analyze the TransUnion credit invoices and compare them to the deal jackets, which Plaintiffs had recovered from the attic of the prior Dealership building.   The deal jackets also provided the critical evidence which Defendants had claimed was missing, namely the sales information, contracts that agreed to pay off existing liens, credit reports, VIN and title information, and other critical documentary evidence.   The core documents from these deal jackets were identified as Trial Exhibits P-54 to P-219 in Plaintiffs' Pre-Trial Memorandum in the event that the Court required evidence of liability and/or damages at trial for individual Class Members in Groups B and C.

In February 2004, Defendants filed a Motion for Leave to Obtain Tax Returns of Absent Class Members, which Plaintiffs were required to oppose on February 26, 2004.   On February 26 and 27, Defendants filed their oppositions to Plaintiffs' Motions for Partial Summary Judgment. Between March 1 and March 3, 2004, Defendants filed responses to Plaintiffs' Motions for Summary Judgment, Proposed Stipulated Facts and filed a Motion to Preclude Plaintiffs' Expert Testimony.   On March 9, 2004, Plaintiffs filed a Motion to Strike Defendants' Answer to Plaintiffs' Proposed Stipulated Facts, which forced Defendants to file amended Answers.

At the same time that the parties were actively litigating this case as described above, the parties were also actively pursuing settlement negotiations.   On March 18, 2004, the parties filed a Joint Motion for Equitable Relief.   The next day, on March 19, 2004, Plaintiffs filed an Opposition to Defendants' Cross-Motion for Summary Judgment.   On March 23, 2004, the Court granted the parties' Joint Motion for Equitable Relief, and on April 30, 2004 the Court issued a Supplemental Order for Equitable Relief, which collectively provided the equitable relief.

On March 31, 2004, the Court denied Defendants' Motion to Serve Written Discovery on Absent Class Members, denied the parties' Motions for Summary Judgment and scheduled a

*Daubert* hearing for May 3, 2004.  The Court held that trial would proceed on Counts I, II, VI and VII before a jury, and severed and stayed Counts III and IV.

On April 14, 2004, Defendants filed a Motion to Trifurcate the Trial.  Although the Court had not ruled on Defendants' Motion to Trifurcate the proceedings, the Court indicated that it might bifurcate the trial on liability and convene hearings on individual damages.  Approval of this settlement obviates the evidentiary and trial management issues.

On April 23, 2004, Magistrate Judge Angell directed the Clerk to remove the case from her docket for trial before Senior Judge Shapiro.  On April 29, 2004, Plaintiffs filed a Motion to Facilitate Defendant Benjamin J. Marchese, III's Appearance at Trial and filed their Opposition to Defendants' Motion to Trifurcate the Trial.  On May 3, 2004, the Court conducted the *Daubert* hearing, which was adjourned at the request of the Defendants to present additional expert testimony and argument.

Throughout the litigation, Plaintiffs and Defendants conducted settlement negotiations.  These settlement negotiations resulted in the Parties' March 18, 2004 Joint Motion For Equitable Relief, and the Court's March 26, 2004 and April 30, 2004 Orders approving the proposed stipulated equitable relief.  Additionally, Plaintiffs, Defendants, Erie Insurance Exchange, and their respective counsel, conducted discussions and arms-length negotiations, which ultimately resulted in the Settlement Agreement and its additional monetary relief.

The Court presided over these settlement negotiations, with the assistance of the Honorable Magistrate Judge M. Faith Angell.  These settlement discussions were contentious.  Erie steadfastly refused to acknowledge that there was any coverage, and continued to assert that there would be no indemnification of any judgment.  In the event of a trial, and in the event that Plaintiffs were successful, a subsequent litigation to determine the extent and nature of insurance coverage was

- 14 -

likely.  Class Counsel, Erie's counsel and the Court all reviewed and thoroughly analyzed the insurance policies.  On May 13, 2004, Plaintiffs, Defendants and Erie Insurance Exchange advised the Court that they had reached a settlement for monetary relief of $2,450,000.

On June 14, 2004, the parties filed a Joint Motion for Preliminary Approval of Settlement. After several conferences with the Court, on July 15, the parties filed a Second Joint Motion for Preliminary Approval of Settlement.   On July 16, the Court issued an Order: preliminarily approving the settlement and form of notice; directing Class Counsel to send the Notice to Class Members; requiring any objections or requests to be excluded from the Class to be filed by September 16, 2004; requiring Class Counsel's application for attorneys' fees and reimbursement of expenses to be filed on or before August 16, 2004 ; and scheduling a fairness hearing for October 4, 2004.

After the September 16, 2004 opt-out and objection period, and prior to the October 4, 2004 hearing, Class Counsel will file a Certification of Compliance with the Court's December 9, 2003 and July 16, 2004 Orders.

## IV.   THE SETTLEMENT AGREEMENT AND THE BENEFITS CONFERRED UPON THE SETTLEMENT CLASS.

As set forth above, the parties actively conducted settlement negotiations, while simultaneously aggressively prosecuting and defending this litigation.  The Court presided over several settlement conferences and closely monitored and supervised the litigation.

On March 26, 2004 and April 30, 2004, the Court entered stipulated Orders that provided equitable relief to the Class.  The value of this equitable relief is reflected by the enormous effort and priority devoted to it by counsel for **both** Plaintiffs and Defendants.  Defendants actively pursued equitable relief because it was in their interests to mitigate damages for trial.

- 15 -

All of the Class Members received equitable relief without paying any attorney's fees or costs out of their pockets.  The value of the legal services received by the Class is reflected in Petitioner's total lodestar itself and costs.  Thus, $1,229,853.81 is a reasonable measure of equitable value to the Class.  The value of restoring accurate credit reporting is evaluated by Richard A. LeFevre to be $5,094,500.  Another measure of value is that the equitable fund is equal to or greater than the monetary fund of $2,450,000.  Additionally, the FCRA itself sets forth a comparative measure of evaluating the equitable relief.  It provides that damages can be actual or statutory.  The statutory damages is $1,000.  Thus, for the approximately 3,700 Group A Class Members, the statutory measure of value for the equitable relief is $3.7 million.  It is far greater for Groups B and C.  Thus, the measure of the equitable relief is reasonably valued in the range from $1,229,853.81 to $2.45 million to $3.7 million to $5,094,500.

Equitable relief is provided to Group A Class Members in the form of, *inter alia,* Defendants jointly sending notification with a consumer dispute verification form to Credit Reporting Agencies representing that (1) the credit report and/or inquiry was obtained without a permissible purpose; and (2) directing each Credit Reporting Agency to immediately correct its records and permanently delete the identified inquiry promptly.  This equitable relief is presently ongoing.

Equitable relief is provided to Group B Class Members in the form of, *inter alia,* Defendants jointly sending notification with a consumer dispute verification form to Credit Reporting Agencies representing that (1) the loan or credit obligation referenced in that letter is not a loan obligation incurred by the identified Class Member; and, (2) directing both the lender(s) and the Credit Reporting Agency to immediately correct their records and permanently delete such an entry immediately.  Additionally, Class Counsel will submit to the Credit Reporting Agencies available

- 16 -

information regarding the consumer, the identity of the fraudulent or unauthorized loan and the date thereof as a Request for Reinvestigation of disputed information pursuant to FCRA §1681i(a).  The Credit Reporting Agencies will investigate those disputes and notify Class Counsel and defense counsel of the results of the reinvestigation.  This equitable relief is presently being implemented.

Equitable relief is provided to Group C Class Members in the form of, *inter alia,* Defendants jointly sending notification with a consumer dispute verification form to Credit Reporting Agencies representing that (1) the loan and credit obligation referenced in the letter relating to the identified Class Member is, after the date of the trade-in, no longer a loan obligation incurred by the identified Class Member; (2) directing both the lender and the credit reporting agency to immediately correct their records and delete reporting any such entry as "delinquent" immediately; and, (3) representing that no delinquency on the identified loan obligation after the trade-in date should ever be referenced or re-inserted again in the identified Class Member's consumer report.  Additionally, Class Counsel will submit to the Credit Reporting Agencies available information regarding the consumer, the identity of the fraudulent or unauthorized loan and the date thereof as a Request for Reinvestigation of disputed information pursuant to FCRA §1681i(a).  The Credit Reporting Agencies will investigate those disputes and notify Class Counsel and defense counsel of the results of the reinvestigation.  This equitable relief is presently being implemented.  Additionally, Defendants have executed and delivered to Plaintiffs' counsel written consents to any petitions to be filed in state court by the Class Members necessary to evidence Defendants' consent to a transfer of the title of the identified trade-in vehicle(s) to the senior lien holder, or if no secured party, to the bona fide purchaser of the identified vehicle.  These petitions will be filed.  There are approximately thirty-three (33) separate lawsuits that are either pending or planned in state court to clarify and transfer title affecting Group C of the Class.

In addition, several Group C Members are Defendants in ongoing state court matters in which lenders are seeking interest, penalties and fees arising from the Defendants' failure to satisfy pre-existing liens.  Class counsel will undertake to resolve these lawsuits.

The settlement also provides monetary relief of $2,450,000 to fund the prosecution and defense of litigation to transfer and clear title for Group C Class Members; to address alleged existing lien obligations for those Group C Class Members who traded-in vehicles and for whom the lien was not paid by Defendants; to be distributed to Group B and Group C Class Members on a *pro rata* basis as compensation for credit damage in proportion to the number of unauthorized loan and/or unpaid lien obligation transactions; and for reimbursement of attorney's fees and litigation costs.

With the measure of the equitable relief is reasonably valued in the range from $1,229,853.81 to $2.45 million to $3.7 million to $5,094,500, the value of the equitable relief and the $2.45 million monetary relief combine for a total settlement value in the range from $3,679,853.81 to $4.9 million to $6.15 million to $7,544,500.

## V.   LEGAL STANDARDS FOR AWARDING FEES TO PLAINTIFFS' COUNSEL

The award of reasonable attorney's fees is within the discretion of the district court.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "[T]he penultimate goal of judicial determination of class counsel fees" is "the award of an amount that 'is fair, adequate and reasonable.'" *Petruzzi's, Inc. v. Darling-Delaware Company, Inc.*, 983 F.Supp. 595, 600 (M.D. Pa. 1997) (quoting *Weiss v. Mercedes-Benz of North America, Inc.*, 899 F.Supp 1297, 1304 (D.N.J.), *aff'd*, 66 F.3d 314 (#d Cir. 1995)).

This case presents a situation where Class Counsel achieved both substantial equitable relief and also a common fund.  It also presents the situation where the first claim asserted by Plaintiffs,

under the FCRA, was a statutory fee shifting claim, which, however, Erie Insurance Exchange asserted was not covered by insurance.  In fee shifting cases, the preferred method of determining attorney's fees is the lodestar method. *Petruzzi's*, 983 F.Supp. at 602.  In common fund cases, the preferred method is the percentage of recovery approach.  *Id.*  To apply a percentage of recovery approach, the equitable relief needs to be evaluated as part of the "common fund."

Although Class Counsel sets forth below reasonable measures for evaluating the equitable relief, the Third Circuit has held that where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method [of calculating class counsel fees]," a district court may employ the lodestar method.  *Petruzzi's*, 983 F.Supp. at 600 (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 821 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995)).  Where the Court expresses any difficulty in making some reasonable assessment of the value of the equitable relief, the Courts utilize the lodestar method. *Id.*; *Charles v. The Goodyear Tire And Rubber Company*, 976 F.Supp. 321, 323-325 (D. N.J. 1997).

In *Charles*, the Court analyzed different methods to evaluate the equitable relief, that consisted of remedial measures and credit vouchers.  *Charles*, 976 F. Supp. At 324.  Class counsel retained an expert to render an opinion of the value.  In citing to *General Motors*, the District Court found that evaluation of the equitable relief was too speculative and rendered a lodestar analysis. *Id.*, 976 F.Supp. at 325.

Similarly, in *Petruzzi's*, the class action settlement involved both equitable relief, in the form of settlement agreements for future relief and the payment of attorney's fees, and monetary relief of $400,000 for the Class.  The District Court reasoned that the ultimate goal of a fair and reasonable attorney's fee "is best achieved in this case by using the lodestar method as the 'primary determinant.'  After all, it has been recognized that '[t]he lodestar is strongly presumed to yield a

- 19 -

reasonable fee.'"  *Petruzzi's*, 983 F.Supp. at 602; (quoting *Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1035 (3d Cir.1996); *General Motors,* 55 F.3d at 821).

Class Counsel therefore present to this Court their lodestar, cross-checked against a percentage of recovery of the value of the entire settlement, comprised of equitable and monetary relief.   When cross-checked, Class Counsel's lodestar is lower than the range of reasonable percentages awarded in common fund cases.[4]

## A.    **THE LODESTAR ANALYSIS.**

To determine appropriate attorney's fees, the court calculates a "lodestar:" the reasonable hourly rate multiplied by the number of hours reasonably expended on successful claims.  *In Re Equimed Inc. No. Securities Litigation (NS)*, 2003 WL 735099 (E.D. Pa. 2003) (citing *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161, 167-68 (3d Cir.1973) ("*Lindy I*"); *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976) ("*Lindy II*")).  The lodestar is presumed to be a reasonable fee.  *McDonald v. McCarthy*, 1990 WL 131393 at *15 (E.D. Pa. 1990) (citing *Blum v. Stenson,* 465 U.S. 886, 897 (1984)).

"Hourly rates must be 'in line with those prevailing in the community for similar service by lawyers of reasonably comparable skill, experience, and reputation.'"  *In Re Equimed* at *2 (quoting *Blum v. Stenson,* 465 U.S. 886, 896 n. 11 (1984) and citing *Smith v. Philadelphia Housing Auth.,* 107 F.3d 223, 225 (3d Cir.1997)).  The prevailing market rate is usually deemed reasonable. *Id.*

---

[4] A petitioner may also request reimbursement for fees and costs incurred in connection with a Fee Petition. *Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, C.A. No. 89-2737, 1996 U.S. Dist. Lexis 19434 (E.D. Pa. December 30, 1996), *cert. denied*, __ U.S. __, 117 S. Ct. 953 (1997).

(citing *Public Interest Research Group v. Windall,* 51 F.3d 1179, 1185 (3d Cir.1995)).[5]

To establish a reasonable hourly rate, the court may examine the same factors which are also applied in analyzing the fairness of a proposed class action settlement.[6]  The prevailing market rate, or, alternatively, the rate the attorney usually charges for services, provides a starting point. *Haymond v. Lundy*, 205 F.Supp.2d 403, 408-09 (E.D. Pa. 2002).  However, discovering the market or usual rate does not end the inquiry.  That number is then adjusted to reflect other considerations. These factors are part of a set of considerations commonly referred to as the "*Johnson* factors," referring to a 1974 Fifth Circuit case.  *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir.1974).

In *Fisher Bothers*, this Court cited to the "*Johnson* factors" and quoted the twelve (12) similar factors identified by the United States Supreme Court in *Hensley* as being relevant to any adjustment to the lodestar:

> The *Hensley* Court stated twelve additional factors that are relevant to the calculation of a reasonable attorney's fee.   To the extent not subsumed within the initial calculation of the lodestar**,** the district court could consider (1) the time and labor required;  (2) the novelty and difficulty of the questions;  (3) the skill required to perform the

---

[5] Current, rather than historic, billing rates, are the appropriate measure in calculating lodestar figures.  For example, the Supreme Court has endorsed the use of current rates in fee petitions filed pursuant to 42 U.S.C. §1988 as a means of compensating counsel for delay in obtaining fees. *Missouri v. Jenkins*, 491 U.S. 274 (1989).  This Court has awarded historic rates rather than current, but then increased the lodestar by 5% for the delay in payment of attorney's fees.  *McDonald* 1990 WL 131393 at *16; *McDonald v. McCarthy*, 1992 WL 167291 (E.D. Pa. 1992).

[6] *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975) (the nine (9) factors that the Court must also analyze in determining the fairness of the proposed settlement are:  (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range or reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation).

> legal service properly;   (4) the preclusion of employment by the
> attorney due to acceptance of the case; (5) the customary fee;  (6)
> whether the fee is fixed or contingent;  (7) time limitations imposed
> by the client or the circumstances;  (8) the amount involved;  (9) the
> experience, reputation and ability of the attorneys;   (10) the
> "undesirability" of the case;   (11) the nature and length of the
> professional relationship with the client;  and (12) awards in similar
> cases.

*Fisher Bothers*, 1987 WL 26480 at *20 (quoting *Hensley*, 461 U.S. at 430 n. 3 and citing *Johnson,*

488 F.2d at 717-719.

The factors are generally identified by most federal courts.  *See, e.g., Gunter v. Ridgewood*

*Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); *In ReWarfarin Sodium Antitrust Litigation*,

2002 WL 2007850 at *29 (D. Del. Aug. 30, 2002); *Davies v. Continental Bank*, 1989 U.S. Dist.

Lexis 1880, *6-*7 (E.D. Pa. 1989).   In *In re American Integrity Securities Litigation*, 1989 WL

89316 at *11-*13, this Court analyzed these factors and awarded a multiplier of 2.1 to 2.5.

The United States Supreme Court has noted that including these factors in the calculation of

a reasonable rate serves the purpose of:

> enabl[ing] private parties to obtain legal help seeking redress for
> injuries resulting from the actual threatened violation of specific
> federal laws.

*Pennsylvania v. Delaware Valley Citizen's Council for Clean Air*, 478 U.S. 546, 565 (1986)

("*Delaware Valley I*").

As more fully set forth in the parties' Joint Motion to Preliminarily Approve the Settlement,

each of the *Girsh* factors weigh heavily in favor of awarding the requested attorney's fees.  This

action has been pursued for several years, through pre-Complaint investigation and litigation. The

reaction of Class Members is difficult to measure precisely prior to the September 16, 2004

objection period, and the October 4, 2004 final hearing.  To date, the reaction of the Class continues

to be positive and Class Counsel have received only one negative telephone call from A Group A Class Member who wants monetary payment.

The third factor concerning the stage of the proceedings also supports Petitioner's requested fee and costs.  The parties were on the eve of trial, and had completed discovery and summary judgment briefing and ruling.  Class Counsel actively pursued discovery from third-parties, all of whom had their own interests to protect, and many of whom refused to cooperate without being compelled to do so.  Class Counsel located and reviewed approximately 4,760 deal jackets in place at Chevrolet of Limerick, and obtained over 420 original deal jackets released into the custody of Class Counsel.  Each deal jacket contained numerous individual documents, and are identified as Plaintiffs' Trial Exhibits by Class Member for Groups B and C.  Class Counsel also thoroughly analyzed the TransUnion records and cross-checked them to the deal jackets to identify 3,700 Group A Class Members.  Much of this work was economically performed by paralegals.

The remaining factors concerning the risks of litigation and the fairness of the settlement also favor the award of the attorney's fees requested and the reimbursement of expenses.  The Court already indicated to the parties that there is a risk of maintaining the class action through trial.  The Defendants do not have the monetary resources to compensate Plaintiffs for credit damages.  Their insurance company, Erie Insurance Exchange, asserted numerous reservations of rights, and stated that it may not pay any potential judgment even if ultimately attained by Plaintiffs.

Similarly, each of the *Hensley* factors weigh heavily in favor of awarding the requested attorney's fees.  The time and labor required is described above in detail and in the attached Affidavits of Mark A. Kearney, Esquire and Cary L. Flitter, Esquire.  This case required enormous work under difficult discovery circumstances that included a defunct business and a bankrupt principal.  The case involved novel and difficult questions of federal credit law, state tort claims of

- 23 -

defamation and invasion of privacy, bankruptcy issues and critical insurance coverage issues. Petitioners provided the skill required to perform these complex legal services properly against sophisticated and experienced opposition counsel. Petitioners were required to deploy several lawyers and paralegals to the case at great expense to their respective law firms, as reflected on the legal invoices filed contemporaneously under seal with the Court. Petitioners' lodestar reflects their customary fee for this type of litigation, and the fee was contingent on success, and is now contingent on this Court's judgment. Petitioners accepted this contingent risk on behalf of a class of consumers, and actively pursued these consumers' rights.

Time was of the essence because of the nature of the ongoing credit damage to the Class. The amount involved is substantial, and, in addition to the equitable relief valued up to $3.7 million, Petitioners achieved a monetary fund of $2.45 million from an obstinate, skeptical and well-represented insurance carrier. The case was undesirable because of its complex and contingent nature. Class Counsel always maintained an open and professional relationship with their clients and the Class, who are consumers. As set forth below, the requested fee is commensurate with awards in other similar cases.

Whether counsel has accepted the case on a contingency basis is particularly significant. *United States v. City and County of San Francisco*, 748 F. Supp. 1416, 1427 (N.D. Cal. 1990). Where the attorney expects no other compensation but from the fee award, the court should consider this in applying a higher fee. *Id*. The contingent nature of the litigation is a primary factor to be assessed in determining the multiplier to be awarded. *See Lindy I*, 487 F.2d at 167-68; *Fisher Brothers v. Cambridge-Lee Industries, Inc.*, 1987 WL 26480 at *20 (E.D. Pa. 1987). To motivate lawyers to assume the substantial risk of nonpayment and the detriments of late payment, even in the event of success, lodestars may be substantially enhanced. As Justice Brennan explained in

- 24 -

*Hensley*:

> Attorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate. The difference, however, reflects the time-value of money and the risk of non-recovery usually borne by clients in cases where lawyers are paid by an hourly rate.

*Hensley*, 461 U.S. at 448-49.

The lodestar may be adjusted upward or downward based upon considerations such as the quality of counsel's work, and the contingent nature and risk of the lawsuit. *Id.* at *3. *See also Lindy I*, 487 F.2d at 167-68; *In re American Integrity Securities Litigation*, 1989 WL 89316 at *12 (E.D. Pa. 1989). Significantly, in this and other circuits, a multiplier of the lodestar is often used in complex common fund cases. As one court has written: "A review of prior judicial precedent discloses the use of multipliers of from one to five times the normal hourly rates charged." *In re Equity Funding Corp. of America Securities Litigation*, 438 F. Supp. 1303, 1334 (C.D. Cal. 1977).[7]

---

[7] Since *Burlington v. Dague*, 505 U.S. 557, 562 (1992), courts have consistently considered and awarded enhancements to provide a reasonable fee. Attorneys can receive enhancements or multipliers of the lodestar amount if the attorney demonstrates that the case fits the requirements for the contingency multiplier. *Delaware Valley II*, 483 U.S. at 734 (O'Connor, J., concurring). Enhancements are particularly appropriate where a case involves novel or complex issues. The contingency enhancement should be applied in the kind of cases from which the enhancement is needed in order for plaintiffs to obtain representation. *Id.* In determining whether a case is appropriate, courts sometimes apply Justice O'Connor's two-factor test from her concurring opinion in *Delaware Valley II*. First, the court analyzes how a particular legal market compensates for contingency cases. Second, if the court finds that the particular market reflects a higher compensation in contingency cases, the fee applicant must demonstrate the degree to which the relevant market compensates for the contingency. *Delaware Valley II,* 483 U.S. at 733. In *Black Grievance Committee v. Philadelphia Electric Co.*, the Eastern District of Pennsylvania found that attorneys in Southeastern Pennsylvania market will not take contingency cases unless their recovery would at least double their normal hourly billing rate. 690 F. Supp. 1393, 1400 (E.D. Pa. 1988). Courts may allow an enhancer for quality of representation. <u>McKenzie v. Kennickell</u>, 875 F. 2d 330, 338 (D.C. Cir. 1989). A court will allow a multiplier of the lodestar award where the case presents novel issues of law. The court may also allow a multiplier based on the risk attributable to the

The risks assumed by Petitioners in this litigation were considerable.  Despite the extensive investigation, significant questions of fact and liability were vigorously contested throughout this litigation.  Petitioners bore the risk attendant in complex litigations that the triers-of-fact might not decide fact questions in their favor.  Additionally, Petitioners were advocates in several forums, including in Bankruptcy Court and against Defendants' insurance carrier, which was represented by two different and substantial law firms.

Courts have found that class action suits require a heightened attorney skill level because they require expertise in class litigation in general and also in the subject matter of the litigation. *United States v. City and County of San Francisco*, 748 F. Supp. 1416, 1426 (N.D. Cal. 1990). Thus, the fact that the applicant seeks fees for work in a class action suit favors a higher fee. *Id*.

A court may also examine biographies submitted by counsel to determine the level of experience and ability of the attorneys. *United States v. City and County of San Francisco*, 748 F. Supp. 1416, 1427 (N.D. Cal. 1990). Where those biographies indicate extensive experience, high ability, and good reputation, the court will consider those qualifications in determining a higher fee. *Id*.  The biographies of the attorneys who worked on this case are attached to the Affidavits of Mark A. Kearney, Esquire and Cary L. Flitter, Esquire.

Notably, Plaintiffs' success is an important factor to consider in determining a reasonable fee.  *Hensley,* 461 U.S. at 434.

> Where a plaintiff has obtained excellent results his attorney should recover a fully compensatory fee.

*Id.*, 461 U.S. at 435.

---

"uncertainty of the law."  *McClendon v. Continental Group, Inc.*, 872 F. Supp. 142, 162 (D.N.J. 1994).

1.      <u>**The Hourly Rates of Class Counsel Are Reasonable.**</u>

The affidavits of Mark A. Kearney, Esq. and Cary L. Flitter, Esq. meet Petitioners' burden to establish a prima facie case that the requested hourly rates are reasonable rate for the work performed in this case. *Horizon Unlimited, Inc. v. Silva*, 2002 WL 1896297 at *2 (E.D. Pa. 2002) (citing *Black Grievance Committee v. Philadelphia Elec. Co.,* 802 F.2d 648, 652-53 (3d Cir.1986) (district court may not disregard attorney's affidavit on reasonable fees when it is uncontradicted); *Cunningham v. City of McKeesport,* 753 F.2d 262, 268 (3d Cir.1985) (no material issue of fact when affidavit is uncontradicted), *vacated on other grounds,* 478 U.S. 1015 (1986)).

In determining whether the rate is reasonable, the court should take into account the attorney's legal reputation, experience and status (partner or associate). *Lindy I*, 487 F.2d at 167.  In *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 591 (3d Cir. 1984), the Court of Appeals determined that attorneys' lodestars should be determined by using "the prevailing market rate for the relevant community." <u>Id</u>. at 591.  The Affidavit of Joseph Kohn, Esq. and the Declaration of James R. Malone, Esq. establish the reasonableness of the requested hourly rates within the established market.  *See* Exhibits "C" and "D."  The Affidavit of Joseph Kohn, Esq. fully further verifies the reasonableness of the work performed by Petitioners.  Additionally, the Declaration of June A. Rangone, Director of Survey Methodology and Analysis at Altman Weil establishes that the requested rates are within the range of the standard hourly billing rates for attorneys in the United States District Court for the Eastern District of Pennsylvania.  *See* Exhibit "E."

The affidavits of Class Counsel include a detailed description of the professional standing of Class Counsel.  The hourly rates of each firm's attorneys and paralegals, which are set forth in the affidavits, represent hourly rates which have been approved by courts in prior class actions as being fair and reasonable.  Indeed, last year, a Court in this District approved hourly rates of $390 and

$225 to class counsel in a Fair Debt Collection Practices Act case for work performed in 2001 and 2002.  *See Bonett v. Education Debt Services, Inc.*, 2003 WL 21658267 at *8 (E.D. Pa. May 9, 2003).  Rates of $390 and $225 are comparable to the hourly rates requested by Class Counsel in this case for work performed in 2003 and 2004.   Here, Class Counsel seek payment of rates ranging from $145.00 an hour to $410.00 for lead trial counsel.

In March 2002, this Court approved hourly rates of $425 and $325.  *Haymond*, 205 F.Supp.2d at 409.  The rate of $425 was approved for an attorney who previously served as co-counsel in a class action with Class Counsel in this case, as well as opposition counsel before this Court.  *See, e.g.*, *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270 (3d Cir. 1993); *In re One Meridian Plaza Fire Litigation*, 1993 WL 228773 (E.D.Pa. 1993); *Holt Cargo Systems, Inc. v. Delaware River Port Authority,* 20 F.Supp.2d 803 (E.D. Pa. 1998), *aff'd*, 165 F.3d 242 (3rd Cir. 1999).

Similarly, this Court approved hourly rates of $320 and $265 for work performed in 1999 by CLS public interest attorneys.  *Jones v. Philadelphia Housing Authority*, C.A. No. 99-67 (E.D. Pa. October 19, 1999).  Given the complexity of this litigation, and the number of parties and non-parties represented by counsel, the range of hourly rates requested to be approved by Petitioners compares favorably to the $320 approved by this Court five (5) years ago.  *See also In re Mellon Bank Shareholder Litigation*, Civil Action No. 87-0755 (W.D. Pa. May 11, 1989) (approving rates as high as $350 per hour); *Nemo v. Astrotech International Corp.*, Civil Action No. 85-982 (W.D. Pa. Dec. 20, 1988) (approving rates as high as $300 per hour).

## 2.    The Hours Expended Were Reasonable.

Under the *Lindy* cases, the court's determination of a just and adequate fee begins with the number of hours expended in the prosecution of the litigation. The total aggregate hours which

counsel spent in prosecuting this case are over 4,179.15.  The litigation was conducted by counsel in

a coordinated and well-organized fashion seeking to work efficiently and to avoid duplicative effort.

The procedural history of this case is described above and in the Affidavit of Mark A.

Kearney, Esquire.  The litigation was defended by two experienced and resourceful law firms.

Additionally, Defendants' insurance company was represented by two large law firms.  Plaintiffs'

Motion for Class Certification was vigorously challenged by Defendants.  This Court is aware that

there were many disputed and complex questions of law.  As this Court knows, the Complaint

alleged claims in developing areas of law.  It can be stated with substantial certainty that no matter

what the outcome might have been at the trial level, the party suffering the disappointment of loss

by jury verdict would most certainly have appealed.  The certainty of appeal brings with it

additional risks for the parties.

The work performed by Counsel for Plaintiffs in this action was very thorough and

extensive.  Discovery involved approximately 3,700 Class Members, whose "deal jackets" had to be

thoroughly and separately analyzed. The approximately 150 Group B and Group C Class Members

all had to have their files analyzed in detail, and most if not all of them were individually

interviewed several times.  As Defendants argued to this Court in their Motion to Trifurcate, all of

these persons are individuals with very personal claims, and Class Counsel counseled all of them.

The litigation was pursued vigorously by Class Counsel, and opposed aggressively by

counsel for the Defendants for over a year.  Petitioners were required to address issues and contest

parties in several forums, including this Court, the United States Bankruptcy Court, the Court of

Common Pleas of Montgomery County and in disputes with Erie Insurance Exchange.  Defendants

or their counsel were uncooperative in discovery.   Nevertheless, through perseverance and

diligence, Petitioners located the vast majority of the "deal jackets," and painstakingly compared

them to the Trans Union files to prove the claims of the Class.  Obtaining the documents from the CRA's was itself a contested battle.  Indeed, several non-parties obtained counsel and appeared before this Court to contest Petitioner's efforts at discovery.

Through all of this litigation, Petitioners worked 4,179.15 hours.  This time was reasonable and necessary.  The contingent nature of this case highlights this fact because Petitioners were always at risk of not being compensated in the event that either (1) Plaintiffs lost the litigation or (2) there was no insurance coverage.  Petitioners therefore had an incentive to only perform work that was reasonable and necessary, while preserving their fiduciary and professional duties to their clients and the Class.

### B. THE COMMON FUND DOCTRINE AND PERCENTAGE OF RECOVERY ANALYSIS

In determining the appropriate amount of fees to be awarded from a common fund, courts have used two different approaches: (1) the lodestar and (2) a percentage of the fund created.  *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975); *In re: Centocor Securities Litigation II*, 1995 U.S. Dist. Lexis 18776 (E.D. Pa. Dec. 14, 1995).  There are several considerations in selecting a calculation method.  A percentage of the fund is often used in Common Fund Cases, which uses a reasonable percentage based on the size of the fund.  The percentage of recovery is sometimes too large and the United States Court of Appeals for the Third Circuit now requires a cross-check with the lodestar method to ensure a reasonable fee. *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000).

In the 1980s, courts and class action practitioners began to comment that the lodestar method had the unfavorable effect of encouraging plaintiffs' counsel to bill more hours to a case, with the inevitable result that cases took longer to resolve.  There were two major changes in the

calculation of fees in the 1980s. The United States Supreme Court noted that, unlike fee-shifting cases, attorneys' fees in common fund cases are based on a percentage of the fund bestowed on the class. Secondly, a Task Force was formed by the United States Court of Appeals for the Third Circuit that recommended a return to the percentage method in common fund cases. The Task Force Report focused on the *Lindy* analysis and the problems of the lodestar method, which included a burden on the judicial system and a disincentive for early settlements. *See Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985).

By the late 1980s, a trend began to emerge in the federal courts to return to the traditional "percentage of recovery" method of awarding fees, in which a court determines a fair percentage of the recovery, with the actual hours logged not being controlling. *See, e.g., In Re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 821-22 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995). Theoretically, this aligns the interests of the lawyers with the interests of the class members – the more the lawyers can recover for the class, the larger the fee they may receive.

In the 1990s, the landscape of class action settlements changed. One of the most discussed opinions was Judge Reed's lengthy analysis in *Georgine v. Amchem Products, Inc.,* 157 F.R.D. 246 (E.D. Pa. 1994), *vacated* 83 F.3d 610, 630 (3d Cir.1996), *aff'd, Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997). Concerns arose over the percentage approach in the class action context, with perceptions that class counsel were agreeing to a premature settlement in exchange for a more economic compensation. *Amchem*, 521 U.S. 591; *In Re General Motors*, 55 F.3d at 805. Nevertheless, the Third Circuit has continued to endorse the use of the percentage method in common fund cases, after cross-checking the fee with the lodestar. *See Gunter*, 223 F.3d 190; *In Re Cendant Corporation PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001).

The fee requested by counsel in this case is fair and reasonable no matter whether it is measured by the percentage of recovery method or by the lodestar method. However, to apply the percentage of recovery method, the Court must ascertain the value of the equitable relief, which is such a critical aspect of this settlement.

Plaintiff's expert, Richard LeFevre, opines that the value of the equitable relief is $5,094,500. *See* Exhibit "F" attached hereto. Mr. LeFevre appeared before this Court at the *Daubert* hearing and this Court qualified him as an expert. Pursuant to Mr. LeFevre's expert evaluation, the combined value of the "common fund" can be reasonably evaluated as $7,544,500. At this valuation, Petitioner's lodestar is approximately 15%.

As set forth below, Class Counsel believe that another reasonable evaluation of the equitable relief is in excess of $3.7 million, which is how Congress legislated a value of $1,000 per violation of the FCRA as a statutory penalty.[8] In addition to the equitable relief, there is a common monetary fund of $2,450,000. Petitioners therefore reasonably assert that the value in a percentage of recovery approach to cross-check the fees is at least $6,150,000. Petitioner's requested lodestar of $1,118,339.50 is 18% of the reasonable value of the combined value of the "common fund" consisting of the equitable and monetary relief.

Another reasonable value of the equitable relief can also be measured by the legal services that were required to accomplish this equitable relief. Although this equitable relief is continuing, Petitioner's total lodestar and costs of $1,229,853.81 itself is therefore a reasonable measure of value for the equitable relief, because that is what was necessary to achieve it. Therefore, the

---

[8] Of the 3,700 Class Members, several people had their credit reports pulled several times. Therefore, the $3.7 million is conservative.

combined value of the "common fund" can be reasonably evaluated as $3,679,853.81.   At this

valuation, Petitioner's lodestar is less than 33% of the "common fund" of $3,679,853.81.

The United States Supreme Court has long recognized that if a plaintiff-representative

successfully establishes or protects a fund in which others have a beneficial interest, the costs of

litigation may be spread among the fund's beneficiaries. *See Trustees v. Greenough*, 105 U.S. 527

(1882).  The Supreme Court has stated:

> A litigant or lawyer who recovers a common fund for the benefit of
> persons other than himself or his client is entitled to a reasonable
> attorney's fee from the funds as a whole.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

The "equitable fund doctrine" or "common fund doctrine" has also been endorsed by the

United States Court of Appeals for the Third Circuit. *Lindy I*, 487 F.2d at 165; *Lindy II*, 540 F.2d at

110. *Accord, In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 582 (3d Cir. 1984); *Silberman v.

Bogle*, 683 F.2d 62, 64 (3d Cir. 1982). The doctrine is premised upon the equitable theory that those

who have benefited from litigation should share its costs. *Boeing Co.*, 444 U.S. at 478. *Accord,

Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 632 (E.D. Pa. 1986).

The equitable fund doctrine, often used in securities and antitrust litigation, has been used in

mass tort litigation as well. *See, e.g., In re Air Crash Disaster at Florida Everglades*, 549 F.2d

1006, 1017-21 (5th Cir. 1977); *Sala v. National Railroad Passenger Corp.*, 128 F.R.D. 210 (E.D.

Pa. 1989); *In re Three Mile Island Litigation*, 557 F. Supp. 96 (M.D. Pa. 1982). *See generally*, H.B.

Newberg, Attorney Fee Awards §2.33 (1986 and June 1989 Supp.) (fee awards in mass tort cases).

In class actions in which a common fund is created, the Supreme Court has indicated that

fees can be computed as a percentage of the common fund recovered. *Blum v. Stenson*, 465 U.S.

886.

The "common fund" created by this Settlement Agreement has a value of between being $3,679,853.81 and $7,544,500.  As noted by one commentator: "[A] common fund is itself a measure of success.  While the common fund recovered may be more or less than demanded or expected, the common fund represents a benchmark from which a reasonable fee will be awarded." H.B. Newberg, Newberg on Class Actions, §14.03 at 186 (2d ed. 1985).

This Court should also consider the influence which experienced counsel have on judicial efficiency and economy. In this litigation, Petitioners' extensive experience enabled them to successfully conclude this complex case prior to trial. Indeed, if the factual and legal issues involved in this case had been tried, thousands upon thousands of additional hours would have been expended by Petitioners with no assurance that the Class would receive anything. Any recovery would have been further delayed by inevitable appeals and the possibility of remand. *See Bleznak v. C.G.S. Scientific Corp.*, 387 F. Supp. 1184, 1189 (E.D. Pa. 1974).

Another relevant consideration in assessing the quality of counsel's efforts is the quality of opposing counsel. Defendants and their insurance company were represented by highly skilled counsel from major firms with substantial financial resources.  The CRA's and many of the financial institutions were also represented by sophisticated and experienced counsel.

Regardless of whether this Court evaluates the common fund of equitable and monetary relief as being $3,679,853.81 and $7,544,500, or some where in between, Petitioners' request of between 15% and 33% of the value of the "common fund" is reasonable.  These percentages are below the range of awards made by this Court and in cases in this Circuit and elsewhere. *See, e.g., In re EquiMed, Inc. Securities Litigation*, 2003 WL 735099 (attorney's fees and expenses of 33 1/3% of the ***gross*** settlement); *In Re Rite Aid Corporation Securities Litigation*, 269 F.Supp.2d 603610-611 (E.D. Pa. 2003) (25% of settlement fund awarded even though it resulted in a lodestar

- 34 -

multiplier of over 4); *Thomas v. NCO Financial Systems, Inc.*, 2002 WL 1773035 (E.D. Pa. July 31, 2002) (attorney's fees of 41% of the fund in a statutory fee case brought under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692); *Sala v. National Railroad Passenger Corp.*, 128 F.R.D. 210 (E.D. Pa. 1989) (30-33%)*; In re Magic Marker Securities Litigation*, [1979-1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,116 (E.D. Pa. 1979) (30% of settlement fund awarded).

Petitioners are experienced in prosecuting complex litigation, including cases in the rapidly developing areas of consumer class actions. Counsel have developed, refined and diligently pursued this case from its inception at their own substantial risk and expense. Furthermore, they conserved judicial resources by seeking and obtaining a substantial recovery for potentially uninsured losses and by avoiding the unnecessary delay and increased legal costs that a trial would bring. As Judge Newcomer stressed in *Sherin v. Smith*:

> It is entirely appropriate to reward expeditious and efficient resolution of disputes in this matter. *O'Rourke v. Healthdyne, Inc.*, C.A. Nos. 84-4295 and 84-4296, slip op. (E.D. Pa. Jan. 16, 1986). Failure to do so would penalize those who conserve legal resources, both of the courts and of the bar, and would place a premium on protracted litigation. Indeed, the resulting penalty would be felt most heavily in cases such as this one which exhibit the universally beneficial result of efficient dispute resolution. Courts should take extreme care to encourage settlement, and to discourage the practice of law in a manner which clogs the dockets and leads to a public disillusionment with and distrust of the law and its practitioners.

[1987-1988 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93,582 at 97,609.

This litigation was efficiently prosecuted with no undue delay and without duplication of effort. Further, counsel pursued the opportunity to settle the action upon terms which are advantageous to members of the settlement Class, especially in light of the risks of litigation discussed herein and of which this Court is aware, perhaps better than any of the parties involved.

The award of fees as a percentage of the recovery will fairly compensate counsel for their legal services and expertise and will reward prompt resolution of the case and the substantial benefit conferred upon members of the Class.   Counsel submit that an award of fees based on the percentage of recovery is reasonable and appropriate in this case where the equitable relief is valued as being in a reasonably measured range of $1,229,853.81 (lodestar and costs) to $3.7 million (Congress in the FCRA) to $5,094,500 (Plaintiffs' expert).   The percentage of recovery under these evaluations for a total settlement value in the range from $3,679,853.81 to $6.150,000 to $7,544,500 are 33% 18% to 15%.   It is respectfully submitted that the award of fees requested herein is eminently fair, reasonable and appropriate when viewed as a percentage of the recovery achieved.

## VI.    REQUEST FOR REIMBURSEMENT OF EXPENSES

There is a "heavy burden" to identify evidence to overcome Plaintiffs' entitlement to all of its costs.  *See In re Paoli R.R. Yard PCB Litig.,* 221 F.3d 449, 468 (3d Cir.2000).  The denial of costs to a prevailing party is considered ***punitive*** against that prevailing party, because of this presumption.  *See* the Clerk's Office Procedural Handbook for the United States District Court for the Eastern District of Pennsylvania (the "Clerk's Handbook"), at p. 32 (citing *Smith v. SEPTA,* 47 F.3d 97 (3d Cir. 1995); *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 926 (3rd Cir. 1985); *Pearlstine v. United States,* 649 F.2d 194 (3rd Cir. 1981); *Delaney v. Capone,* 642 F.2d 57 (3d Cir. 1981); *Samuel v. University of Pittsburgh,* 538 F.2d 991 (3d Cir. 1976); *ADM Corp. v. Speedmaster Packing Corp.,* 525 F.2d 662 (3d Cir. 1975)).

The expenses incurred by Petitioners were necessary and reasonably related to the interests of the Class. Accordingly, such expenses should be reimbursed. *In re THC Financial Corp. Litigation*, 86 F.R.D. 721, 740 (D. Haw. 1980).

Petitioners seek reimbursement of out-of-pocket expenses totaling $111,514.31. A breakdown of expense disbursements is set forth in the Affidavits of Mr. Kearney and Mr. Flitter. Costs need only be sufficiently itemized to allow the Court to make an informed determination of whether the requested costs are allowable. Clerk's Handbook at p. 37 (citing *Harceg v. Brown*, 536 F. Supp. 125 (N.D. Ill. 1982); *see also Morrissey v. County Tower Corp.*, 568 F. Supp. 980 (E.D. Mo. 1983)).

Where, as here, counsel verifies by affidavit that the costs petitioned for are the actual costs incurred, the affidavit bears great weight when ruling upon whether the costs requested are the actual costs. Clerk's Handbook at p. 37 (citing *In re: Kulicke and Soffa Industries, Inc. Securities Litigation*, 747 F. Supp. 1136 (E.D. Pa. 1990), *aff'd*, 944 F.2d 897 (3d Cir. 1991); *Greene v. Fraternal Order of Police*, 183 F.R.D. 445 (E.D. Pa. 1998)). The Affidavit of Counsel, in conjunction with the detailed ledgers filed contemporaneously with the Court far exceeds this liberal standard.

Of these expenses incurred, a significant portion consisted of expert fees and copy costs. As this Court indicated at the first Rule 16 Conference on June 18, 2003, experts were a critical and indispensable aspect of this case. Defendants similarly retained three experts. Defendants filed motions to trifurcate the trial and to preclude Plaintiff's expert testimony at trial. The Court convened a *Daubert* hearing to test the expert evidence. This case settled during the adjournment of that *Daubert* hearing. The expenses of experts are recoverable, especially where they are indispensable. *See Black Grievance Committee*, 802 F.2d at 657; *Black Grievance Committee v. Philadelphia Elec. Co.*, 690 F.Supp. 1393, 1403-04 (E.D. Pa. 1988).

Copy charges in this case were $0.25 per page. Charges of $0.25 per page for copying have also been approved by courts of this District. *Kisser v. Coalition for Religious Freedom*, C.A. No.

95-0174, 1995 U.S. Dist. Lexis 14548, *5 (E.D. Pa. 1995).  *See also Brokerage Concepts*, at *43-*44 (approving $0.22 per page for copying).  Indeed, the Clerk of the United States District Court for the Eastern District of Pennsylvania charges $0.50 per page for copying. [9]

The copying costs in this case were large because Class Counsel disseminated notice twice by direct mail to over 3,700 Class members.  If Class Counsel had outsourced the direct mail notice, although the individual charge for copying per page may have been lower, the administrative charges were estimated to be in excess of $10,000 for each mailing.

The cost of deposition transcripts is indisputably recoverable.  *In re: Paoli Railroad Yard PCB Litigation,* 221 F.3d 449 (3rd Cir. 2000); *In Re: Kulicke & Soffa Industries Inc. Securities Litigation,* 747 F. Supp. 1136 (E.D. Pa. 1990), *aff'd*, 944 F.2d 897 (3rd Cir. 1991); *Nuqqet Distributors Cooperative of America v. Mr. Nuqqet, Inc.,* 145 F.R.D. 54 (E.D.Pa. 1992); *Raio v. American Airlines,* 102 F.R.D. 608 (E.D.Pa. 1984).  Significantly, when a party deposes a witness, there is a very strong presumption that the witness' testimony meets this standard of necessity.  *U.S. Industries v. Touche, Ross & Co.*, 854 F. 2d 1223 (10th Cir. 1988); *Marcoin, Inc. v. Edwin K. Williams & Co.,* 88 F.R.D. 588 (E.D. Va. 1980).  The United States District Court for the Eastern District of Pennsylvania has adopted the majority view that witness fees are recoverable even if the witness does not testify.  *See* Clerk's Handbook, at p. 41; *Greene v. Fraternal Order of Police*, 183 F.R.D. 445 (E.D. Pa. 1998); *Haroco v. American Nat'l Bank and*

---

[9] Substantial and controlling authority holds Plaintiff's photocopying charges attributable to discovery and the court's and opposing counsel's copies of pleadings, motions, and memoranda are "reasonably necessary for use in the case" and must be awarded.  *State of Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 867 (7th Cir. 1981); *Arachnid, Inc. v. Valley Recreation Products, Inc.*, 143 F.R.D. 192, 193 (N.D. Ill. 1992); *Voight v. Subaru-Isuzu Automotive, Inc.,* 141 F.R.D. at 103; *Galuba v. Brunswick Corp.*, 139 F.R.D. 652, 655 (E.D. Wis. 1991); *Board of Directors, Water's Edge v. Anden Group*, 135 F.R.D. 129, 138 (E.D. Va. 1991).

*Trust of Chicago*, 38 F.3d 1429 (7th Cir. 1994); *Marino v. Town of Kirkland*, 146 F.R.D. 49 (N.D.N.Y. 1993).

Costs for computerized legal research are properly included in a calculation of attorneys' fees. *Uniroyal Goodrich Tire Co. v. Mutual Trading Co.*, 63 F. 3d 516, 526 (7th Cir. 1995); *Brokerage Concepts Inc. v. U. S. Healthcare Inc.*, 1996 U.S. Dist. Lexis 18519, at *42 (E.D. Pa. December 10, 1996). Charges of $1 per page for facsimiles have also been approved by courts of this District. *See*, *e.g.*, *Brokerage Concepts* at *43 - *44.

**VII.** **CONCLUSION**

For all of the foregoing reasons set forth above, Petitioners respectfully request that the Court enter an order awarding Petitioners $1,118,339.50 for attorney's fees and $111,514.31 for reimbursement of expenses and costs, plus interest accrued thereon.

Respectfully Submitted,

/s Timothy T. Myers                                    /s Cary L. Flitter
Timothy T. Myers, Esquire                         Cary L. Flitter, Esquire
Mark A. Kearney, Esquire                          Lundy, Flitter, Beldecos & Berger, P.C.
Elliott Greenleaf & Siedzikowski, P.C.      450 North Narberth Avenue
Union Meeting Corporate Center V             Narberth, PA   19072-1898
925 Harvest Drive, P.O. Box 3010
Blue Bell, PA   19422

Attorneys for Plaintiffs

Dated:  August 16, 200

## CERTIFICATE OF SERVICE

I, Mark A. Kearney, hereby certify that on this date I served a copy of the foregoing Joint Petition for Reimbursement of Expenses and Costs and for an Award of Attorney's fees on the following by first class mail:

Joseph F. Van Horn, Jr., Esquire
Bodell, Bove, Grace & Van Horn
30 South 15th Street, 6th Floor
Philadelphia, PA 19102

John W. Ashley, Esquire
33 South Seventh Street
P.O. Box 4180
Allentown, PA 18105-4180

Michael J. Miller, Esquire
Drinker Biddle & Reath
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996


/s/  Mark A. Kearney
Mark A. Kearney


Dated: August 16, 2004