IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL M. CICCARONE,   )
RHONDA MEKOSH   )
and MICHAEL MEKOSH   )
   )
      Plaintiffs,   )   Case No. 03 - 1660
   )
  vs.   )
   )
B.J MARCHESE, INC.,   )
BENJAMIN MARCHESE, JR. and   )
BENJAMIN MARCHESE, III   )
   )
      Defendants.   )

## **AFFIDAVIT OF RICHARD F. LE FEBVRE**

I, Richard F. Le Febvre, the undersigned, make this affidavit pursuant to 28 U.S.C. § 1746; that I am over the age of twenty-one; that I am competent to give testimony; and that the following statements herein are based upon my personal and professional knowledge and expertise, and are within a reasonable degree of credit and lending certainty.

1.    I am President and CEO of AAA American Credit Bureau, Inc. ["AAA"]. My experience and knowledge come from my previous operation and management of a credit reporting agency ["CRA"] located in Flagstaff, Arizona. AAA was a company that obtained and merged credit information from the three major nationwide repositories (Experian, TransUnion, and Equifax) and prepared credit reports for their end-users who had permissible purpose on a nationwide basis.

**Background and Experience**

2.    I have worked in the credit reporting industry for more than fourteen years. I have been President/CEO of AAA for thirteen years. My past responsibilities at AAA included managing the company's day-to-day operations, overseeing re-scoring, and managing our

consumer disputes department.

3. AAA and I have handled, updated, and corrected more than 75,000 consumer reports/disputes as required under the Fair Credit Reporting Act ("FCRA"). We handled these disputes when the subject consumer or lender had concerns regarding the consumer's eligibility for credit. Also, if the credit scores seemed abnormally low based on the facts in the consumer's credit report as judged by the lender. I have reviewed more than 30,000 credit applications over my 15 plus years in the real estate industry as a CRA, loan officer, and owner of an escrow company.

4. I have worked with consumers, lenders, credit furnishers, and the three national credit repositories (Experian, TransUnion, and Equifax) to correct inaccuracies that caused the lender to deny the consumer credit or charge higher fees. These inaccuracies were always the result of the inaccurate reports generated from the data we received from all three national credit repositories. I have the knowledge and expertise regarding how lenders look at a consumer's overall eligibility, risk-based pricing, and rates/terms. I also know how much time and effort it takes consumers when they dispute with furnishers and the three national credit repositories.

5. My work in re-scoring and helping consumers' correct errors in their credit reports has drawn national attention. This includes the national media, invitations to participate in congressional hearings, and invitations from the Federal Trade Commission ["FTC"] to participate in roundtable discussions regarding the FCRA, FACTA, inaccuracies, and credit scoring.

6. Credit scoring is fundamentally important to the American economy as a whole and to individual Americans. "The American Dream" of owning a home, obtaining a job, an automobile, or obtaining credit, insurance, or any other valuable asset now involves the creditors' use of a credit report and a credit score. I have re-scored a consumer's file when the lender or consumer has reason to believe that the credit files contain errors/problems or an extremely low

credit score. These problems often result from, but are not limited to, the following reasons:

- Updating account balances
- Deleting/updating inaccurate tradelines
- Deleting obsolete tradelines
- Updating/deleting public record data
- Deleting inaccurate late payments
- Updating incomplete and/or missing data

7. Every day, these errors can and do cost consumers money and/or result in denials of credit, insurance, and employment. The errors cost consumers money by causing increased interest charges and/or less favorable credit terms. Inaccurate information in credit reports is a recurring and troubling problem that, under current practices in several huge industries, now directly affects many facets of a consumer's life. I have seen and heard the frustration of consumers who learn of these problems during our reinvestigation and/or through our other services. AAA was one of the first credit reporting agencies that had the ability to re-score consumers' credit files. This dates back to 1998. AAA has recalculated a great number of consumers' credit scores with great success, and is considered one of America's foremost rescoring companies *(Washington Post 07/01)*.

8. As part of my day-to-day job duties, I analyze hundreds of consumer credit reports monthly and compare the consumer credit information from each of the three major national credit reporting agencies – Equifax Credit Information Services, Inc., Trans Union Corporation and Experian Information Solutions, Inc. – to determine whether the information is accurate and how the information impacts on the consumer's credit score, loan decision, and creditworthiness.

9. As a result of my experience, I have particular expertise with understanding and analyzing credit reports, credit scores, and the codes and documents used by credit reporting

agencies and lenders in connection with determining a consumer's eligibility for credit. This experience also includes having expertise relating to the impact of inaccurate credit information on a consumer's credit score(s), credit risk, and credit worthiness as it relates to a consumer's financial needs.

## **Value of the Settlement**

10. At the request of plaintiff's counsel, I have reviewed the following court documents and agreements (1) Settlement Agreement and Release, (2) Order for Equitable Relief dated March of 2004, (3) Supplemental Order for Equitable Relief dated April of 2004, and (4) the Revised Plan of Allocation of settlement through July of 2004, regarding their clients Michael M. Ciccarone, Rhonda Mekosh, and Michael Mekosh who, on behalf of themselves, and on behalf of all others similarly situated.

11. The harm done to many class members without their consent and knowledge will be mitigated by this settlement both presently, and in the future for class members who have been damaged or impaired by this identity theft.

12. I have been asked to evaluate the proposed settlements of the above named class action lawsuit against B.J. Marchese, Inc., Benjamin Marchese, Jr, and Benjamin Marchese, III in terms of the value of the equitable relief for all plaintiffs and what it would cost class members to get the challenged information removed from their credit files on an individual basis, if they could, under the circumstances.

13. Most class members would have three options. First, they could of course do nothing. Second, they could hire a re-scoring company like AAA during the mortgage process to assist them in having the numerous issues removed. The cost of this service on a national basis ranges from $100 to $500 and would depend on how many different tradelines were involved and if the furnisher was corporative (which would be the largest factor). Third, they could hire a "credit repair" clinic. These companies charge $500 to $1000 or even more, depending on a

consumer's desperation. (Many of these companies unfortunately operate in violation of the Federal Credit Repair Organizations Act, a law passed a few years ago to combat abuses in the credit repair industry.) These companies do not guarantee results, and in many cases the consumer receives no benefit at all and is left with nothing to show for his or her money.

14. The most impressive and unprecedented relief obtained by class members as a direct result of this case is that over **three thousand (3,700)** consumers many whom had no knowledge that their privacy had been invaded and who were also not aware that they even suffered any damages will also get relief.

## **Value of Equitable Relief for Group "A"**

15. In short, with respect to the cost of having a third party correct the problem, the minimum value of the settlement to individual class members in this group is at least $100. The FCRA allows for statutory damages of $100 - $1000 since impermissible access to consumer reports is hard to evaluate under certain circumstances.

16. I should add that, even if the efforts of the class member's or their agents were successful outside of the class, there would be no guarantee that the impermissible access would not create other issues in the future. Consequently, the class member could be faced with the added cost of having to repeat the process, which could create other damages.

17. I have also been asked by plaintiff's counsel to address the cause and effect of having the impermissible inquiry reported then removed, and how that would affect an average class member. I can state to the court within a reasonable degree of professional and credit certainty and under general terms that it would have a positive affect in both credit scoring and credit worthiness.

18. The average equitable relief for the overall class "A" member will be closer to an **average of $300 - $400 per class member**. Some class members will have little or no equitable relief and still others will have much more above and beyond my average estimate as stated

above. I evaluate and estimate the total equitable relief for group "A" is **$1,295,000.00.**

## Value of Equitable Relief for Group "B"

19. I break down group "B" loans taken out without the members knowledge and consent into five categories (1) loans carrying a balance with no adverse reporting, (2) loans with a balance with minor adverse reporting, (3) loans with a balance with major adverse reporting, (4) loans with no balance, but minor adverse reporting, and finally (5) loans with a balance with major adverse reporting and legal action taken against a class member. It has been represented to me that the class size for group "B" is approximately eighty nine (89) class members.

20. I have also been asked by plaintiff's counsel to address the cause and effect of having these five types of bogus loans reported then removed, and how that would affect an average class member. I can state to the court within a reasonable degree of professional and credit certainty and under general terms that the settlement will have a positive affect in both credit scoring and credit worthiness. In my five categories, numbers 3 and 5 would have the most equitable relief followed by numbers 2 and 4 with number 1 having the least equitable relief, but all parties in group "B" would have some form of relief.

21. I can give the Court my opinion on the average equitable relief for group "B". My opinion is very conservative, and is only based on one bogus loan plus only one impermissible access. Some class members may have more damages based on multiply bogus loans and still others may have multiply impermissible accesses by the defendants and other credit grantors. I conservatively value the overall class for group "B" in the following manner:

- Category #1 - an **average of $1000 per class member**.
- Category #2 - an **average of $5000 per class member (many factors applied).**
- Category #3 - an **average of $7,000 per class member.**
- Category #4 - an **average of $2000 per class member (many factors applied).**
- Category #5 - an **average of $10,000 per class member.**

22.     Some class members will have different variations of this equitable relief based on time and other factors including who the furnisher is, their policies, how each handles their bad debt, if they sell that bad debt to third parties, or if they take legal action. I can still say that the average equitable relief for the overall class in group "B" will be closer to an **average of $8,500 per class member** and will grow higher the longer it takes this case to be finalized, court orders are issued, and the class lawyers begin to negotiate with the furnishers and the three repositories. I evaluate and estimate the total equitable relief for group "B" is **$756,500.00.**

### Value of Equitable Relief for Group "C"

23.     In short, with respect to the cost of having the consumer, a third party, or lawyer correct the problem "if possible, but is highly unlikely without litigating", the minimum value of the settlement to individual class members in this group is much higher.

24.     Group "C" includes two categories: (1) members who traded in their automobiles and defendants did not satisfy the pre-existing liens and (2) members who purchased used automobiles for which the pre-existing liens were not satisfied. The class size for group "C" is approximately ninety (90) class members.

25.     I should add that, this group is by far more complex and the individual class members would sustain more damage by the actions of the defendants then groups A or B. This group is more likely to have only "major" adverse reporting, which included repossessions and legal filings leaving class members with no asset and many times still liable.

26.     I have also been asked by plaintiff's counsel to address the cause and effect of having these two types of categories reported then removed, and how that would affect an average class member.  This group would sustain the most credit damage based on being first reported as repossessed then followed by legal action to either collect the debt or collect the automobile in question.  The removal of these two major adverse reportings would have the most positive affect in both the class member's credit score and their overall credit worthiness.

27. I give the following opinion based on pending and/or threatened legal actions against class members in categories 1 and 2 above. My opinion on the average equitable relief for this group is:

- Category #1 - an **average of $15,000 per class member (plus fees and value of vehicle)**.
- Category #2 - an **average of $21,000 per class member (plus fees and value of vehicle)**.

28. Some class members will have different variations of this equitable relief based on time and other factors including who the furnisher is, their policies, how each handles their bad debt, if they sell that bad debt to third parties, if the member needs to find another vehicle, and hiring a lawyer. The average equitable relief for the overall class in group "C" will be closer to an **average of $17,000 per class member** and will grow higher the longer it takes this case to be finalized, court orders are issued, and the class lawyers begin to negotiate with the furnishers and the three repositories.

29. The longer it takes to bring this equitable relief the larger the damages are for class members. Members of groups "B" and "C" will be more negatively affected by delays than group "A". Members in groups "B" and "C" will also be exposed to multiple duplications as these bad debts are bought and sold to numerous bad debt buyers creating additional credit damage. I evaluate and estimate the equitable relief for "C" class members to be approximately **$3,043,000.00.**

### Conclusion Regarding Settlement and Class Counsel's Effort

30. It is my opinion that the value of the total equitable relief for all class members is approximately **$5,094,500.00.**

31. While the settlement has a number of components, the following remarks relate to what class counsel will do in order to restore (the best they can) the class members credit reports,

credit reputation, and credit worthiness. This means lots of man hours and having a trained staff and/or hiring someone to train their staff to ensure that the proposed settlement agreement as it relates to the class members' credit reports is enforced. In my own words this is a massive undertaking.

32. In my more than fifteen plus years dealing with both credit furnishers and all three national repositories processing these kinds of requests and making sure these corrections go into effect will be no small undertaking. All parties must work together in unison regarding inquiries, bogus loans, and legal actions to make sure once deleted they stay deleted and/or corrected.

I state the above opinions within a reasonable degree of credit and professional certainty.

## Compensation

I am being compensated for my unique expertise at the rate of $250.00 per hour for non-testimonial consultation, expert report, or review and advice. I charge at the rate of $350.00 per hour for my court testimony and/or deposition. These fees do not include my expenses and travel, which are separately itemized.

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

This the 16th day of August, 2004

Richard F. Le Febvre
2532 N. 4th Street * Suite #333
Flagstaff, AZ  86004
928-773-0070